ESTATE OF HOWARD T. ROE, DECEASED, GEORGE L. ROE, EXECUTOR, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 77315–77318. Filed August 31, 1961.

---

[1] The following proceedings are consolidated herewith: Estate of Howard T. Roe, Deceased, George L. Roe, Executor, and Eleanor Roe, Docket No. 77316; George L. Roe and Jessie R. Roe, Husband and Wife, Docket No. 77317; and George L. Roe, Docket No. 77318.

*John B. Huffaker, Esq.*, for the petitioners in all docket numbers and *Henry T. Reath, Esq.*, for the petitioners in Docket Nos. 77315 and 77316.

*Albert Squire, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in income tax and additions to tax as follows:

| Petitioner | Docket No. | Year | Deficiency | Additions to tax | |
|---|---|---|---|---|---|
| | | | | Sec. 293(b)* | Sec. 294(d)(2)* |
| Est. of Howard T. Roe | 77315 | 1947 | $409.92 | $204.96 | $24.40 |
| Est. of Howard T. Roe and Eleanor Roe | 77316 | 1948 | 3,414.18 | 1,707.09 | 205.65 |
| | | 1949 | 4,436.64 | 2,218.32 | 267.28 |
| | | 1950 | 4,284.46 | 2,142.23 | |
| | | 1951 | 3,965.10 | 1,982.55 | |
| George L. Roe & Jessie R. Roe | 77317 | 1948 | 3,186.68 | 1,593.34 | 191.20 |
| | | 1949 | 4,060.96 | 2,030.48 | 241.86 |
| | | 1950 | 4,212.24 | 2,106.12 | |
| | | 1951 | 3,528.30 | 1,764.15 | |
| George L. Roe | 77318 | 1947 | 349.35 | 174.68 | 20.96 |

* Internal Revenue Code of 1939.

The issues in these consolidated cases are:

(1) Whether in each of the years 1947 through 1951 Howard T. Roe and George L. Roe, who were partners in Howard T. Roe Co., understated their distributive shares of partnership income by understating the gross receipts of the partnership for its fiscal years ended April 30, 1947 through 1951;

(2) Whether the partnership is entitled to deductions for certain commissions purportedly paid by it in each of the fiscal years ended April 30, 1947 through 1951;

(3) Whether the partnership is entitled to deductions for entertainment of customers and for labor and materials in the fiscal years ended April 30, 1947 through 1951;

(4) Whether the partnership overstated its closing inventory on April 30, 1949, by approximately $18,000;

(5) Whether the deficiencies and additions to tax determined by respondent for the year 1947 in Docket No. 77318 (George L. Roe) are barred by the statute of limitations;

(6) Whether the deficiencies and additions to tax determined by the respondent for the year 1947 in Docket No. 77315 (Estate of Howard T. Roe, Deceased, George L. Roe, Executor) and for the years 1948 through 1951 in Docket No. 77316 (Estate of Howard T. Roe, Deceased, George L. Roe, Executor, and Eleanor Roe) are barred by the statute of limitations;

(7) Whether any part of the deficiency for the year 1947 in Docket No. 77318 (George L. Roe) is due to fraud with intent to evade tax;

(8) Whether any part of the deficiency for the year 1947 in Docket No. 77315 (Estate of Howard T. Roe, Deceased, George L. Roe, Executor) and for each of the years 1948 through 1951 in Docket No. 77316 (Estate of Howard T. Roe, Deceased, George L. Roe, Executor, and Eleanor Roe) is due to fraud with intent to evade tax;

(9) Whether the petitioners in Docket Nos. 77315 and 77316 are liable for additions to tax under section 294(d)(2) of the Internal Revenue Code of 1939 [2] for the years 1947 through 1949; and

(10) Whether the petitioners in Docket Nos. 77317 and 77318 are liable for additions to tax under section 294(d)(2) for the years 1947 through 1949.

Petitioners in Docket No. 77317 (George L. Roe & Jessie R. Roe, Husband and Wife) have conceded that a part of the deficiency for each of the years 1948 through 1951 is due to fraud with intent to evade tax.

#### FINDINGS OF FACT.

Howard T. Roe, deceased, and his widow, Eleanor, were residents of Springfield, Pennsylvania, during the years here involved. Howard filed an individual income tax return for 1947 with the then collector of internal revenue for the first district of Pennsylvania. Howard and Eleanor filed joint returns for the years 1948 through 1951 with the then collector of internal revenue for the first district of Pennsylvania. George L. Roe and Jessie R. Roe, husband and wife, are residents of Media, Pennsylvania. George filed an individual income tax return for 1947 with the then collector of internal revenue for the first district of Pennsylvania. George and Jessie filed joint returns for the years 1948 through 1951 with the then collector of internal revenue for the first district of Pennsylvania.

During the years 1947 through 1951 Howard and his son, George, were equal partners in a partnership known as Howard T. Roe Co., which had been formed in 1943. Prior to that date the business had been conducted in corporate form. The partnership operated on a fiscal year ending April 30. Its books were kept and its returns were filed on a cash receipts and disbursements method. The partnership, which had its office in Havertown, Pennsylvania, was engaged in the business of boiler setting and erecting in various types of commercial buildings. The work included the repairing of the brickwork in boilers. About 1944 or 1945 the partnership, under the instigation of George, had expanded its business to include the larger installation of complete boiler units.

---

[2] All section references will be to the Internal Revenue Code of 1939, as amended, unless otherwise noted.

During the years 1947 through 1951 Howard did not take an active part in the partnership business. He did not concern himself with office activities nor was he familiar with the partnership's books and records during this period. He made occasional visits to the office and at times would visit a jobsite. He was not familiar with the new type of business that the partnership engaged in after 1945. About 1945 Howard suffered a heart attack and shortly after that he had a second. From 1948 through 1951 he was treated for hypertension and for his heart condition, and by 1951 he was about 50 percent incapacitated. From about 1954 he was confined to his home. He was 75 years old at the time of this trial and he died shortly thereafter.

Since about 1938 or 1939 George was in charge of the partnership's records, and since about 1944 or 1945 he was making all the decisions in the partnership's operations.

During the period from May 1946 through April 1951 Howard's signature appeared on 112 checks out of a total of 3,550 checks drawn by the partnership in payment of expenses. The 112 checks signed by Howard were evenly distributed throughout this period.

After 1945 most of the work on the partnership involved new construction of boilers and the materials for such jobs were usually shipped to a railroad siding nearest the jobsite and then transported to the jobsite. During the years here involved the partnership had a small amount of materials in its yard for use in repair jobs. This material included insulation, firebrick, and mortar for firebrick.

The partnership returns of income for the fiscal years ended April 30, 1947 and 1948 do not show any inventory. The return for the fiscal year 1949 showed a closing inventory of $20,000 on the profit and loss statement. In the return for the fiscal year 1950 the profit and loss statement indicates neither an opening nor a closing inventory, but the balance sheet in this return indicates an inventory of $20,000 at the beginning and the end of the fiscal year 1950. In the partnership return for the fiscal year 1951 the profit and loss statement shows an opening and closing inventory of $20,000.

The partnership returns of income for the fiscal years ended April 30, 1947 through 1951, showed the following:

| Year ended April 30— | Sales | Ordinary net income | Distributive share | |
|---|---|---|---|---|
| | | | Howard | George |
| 1947 | $165,707.31 | $9,520.03 | $4,760.02 | $4,760.01 |
| 1948 | 236,274.81 | 6,939.79 | 3,469.90 | 3,469.89 |
| 1949 | 230,768.66 | 3,551.27 | 1,775.63 | 1,775.64 |
| 1950 | 198,187.21 | 8,540.11 | 4,270.05 | 4,270.06 |
| 1951 | 407,850.04 | 35,955.93 | 17,977.96 | 17,977.97 |

Howard and George reported their distributive shares of partnership income, in the above amounts, on their respective income tax returns filed for the years 1947 through 1951.

During the years here involved the partnership maintained a columnar journal which was a combination cash receipts and disbursements book, and the partnership also maintained a general ledger which showed accounts for assets, liabilities, and net worth. In each of the fiscal years ended April 30, 1947 through 1951, the totals of the sales in the columnar journal were identical to the amount of sales reported by the partnership for those fiscal years.

During the fiscal years ended April 30, 1947 through 1951, the partnership received from customers the following payments by check representing receipts for boiler work done and for sales of scrap, which were not entered as sales on its books and which were not included in the amount of sales reported in its returns for those years:

| Fiscal year ended April 30— | Number of customers | Total amount received |
|---|---|---|
| 1947 | 2 | *$867. 64 |
| 1948 | 13 | *24, 715. 22 |
| 1949 | 14 | *28, 330. 95 |
| 1950 | 11 | *17, 595. 19 |
| 1951 | 8 | *8, 114. 90 |

*These fiscal year totals include payments received by the partnership in each of the fiscal years 1947 through 1951 for scrap sold in the respective amounts of $99.63, $328.62, $701.56, $391.32, and $1,308.56. For the year 1947, $768.01 of the total represents five checks received from one customer on five different dates.

These omitted sales receipts were all from customers whose names appeared on the partnership's books.

The following checks were included in the above totals of unreported sales receipts:

| Date of check | Amount | Payor |
|---|---|---|
| Aug. 21, 1947 | $896. 81 | Phillips Packing Company, Inc. |
| Nov. 5, 1947 | 4, 783. 90 | Combustion Engineering Company, Inc. |
| Feb. 16, 1948 | 2, 958. 60 | Owens-Illinois Glass Company. |
| Mar. 16, 1948 | 4, 000. 00 | Parish Pressed Steel Company. |
| June 6, 1949 | 7, 500. 00 | Riggs Distler & Company, Inc. |
| Jan. 9, 1950 | 320. 98 | Combustion Engineering Company, Inc. |
| Jan. 30, 1950 | 1, 793. 64 | Pennsylvania Railroad Company. |
| Mar. 3, 1950 | 222. 71 | Pennsylvania Railroad Company. |
| Mar. 16, 1950 | 2, 260. 00 | The Philip Carey Manufacturing Co. |
| Apr. 24, 1950 | 1, 087. 41 | The Claridge Hotel. |
| May 9, 1950 | 393. 55 | The Claridge Hotel. |
| July 14, 1950 | 160. 86 | General Electric Co. |
| July 18, 1950 | 298. 49 | M. J. Hunt's Sons. |
| July 24, 1950 | 788. 82 | Combustion Engineering Company, Inc. |
| Oct. 5, 1950 | 285. 10 | M. J. Hunt's Sons. |
| Nov. 10, 1950 | 131. 10 | Parish Pressed Steel Company. |
| Total | 27, 881. 97 | |

The partnership maintained a bank account at the Clifton Heights National Bank, Clifton Heights, Pennsylvania. George and his wife, Jessie, also maintained an account at the same bank. Howard did not have a personal bank account during the years 1946 to 1951. The first five checks listed immediately above, totaling $20,139.31, were

deposited in the partnership's bank account, while the remaining checks listed immediately above, totaling $7,742.66, were deposited in the bank account maintained by George and Jessie. The five checks that were deposited in the partnership's bank account were entered on the partnership's books as loans received from the partners, and the following credits were made in the loan accounts of George and Howard:

| Date of entry in journal | Partner's loan account | |
|---|---|---|
| | George | Howard |
| Aug. 25, 1947 | | $896.81 |
| Nov. 6, 1947 | $4,765.32 | |
| Mar. 8, 1948 | 3,000.00 | |
| Mar. 18, 1948 | | 4,000.00 |
| June 2, 1949 | 5,000.00 | 2,500.00 |

During the years here involved Marvin G. Kluttz was employed by the partnership as superintendent of the steel department, which involved boiler erection and repairs. Kluttz was not paid a salary but he was paid 50 percent of the net profit on all jobs performed by him. Kluttz was paid his commissions by check. Kluttz incurred various expenses on his jobs and he was reimbursed in cash for these expenditures by the partnership. During some of the years here involved, H. D. Frankel was employed by the partnership as an outside salesman, and he was paid a commission of 5 percent of the gross profit on jobs obtained by him. During the years here involved the partnership, in order to obtain some jobs, made small payments ranging from $25 to $50 to engineers in the customers' employment.

The partnership drew the following checks payable to Howard for rental of the office used by the partnership:

| Date of check | Amount |
|---|---|
| Apr. 30, 1947 | $1,200 |
| Dec. 8, 1947 | 800 |
| June 3, 1948 | 400 |

These checks were endorsed by Howard and cashed by George on June 3, 1948.

In 1955 George was convicted in the United States District Court for the Eastern District of Pennsylvania under section 145(b), upon his plea of nolo contendere, for filing a false and fraudulent joint income tax return for each of the years 1948 through 1951.

George and Howard made declarations of estimated tax for the years 1947, 1948, and 1949 as follows:

| Year | George | Howard |
|---|---|---|
| 1947 | $442 | $735.30 |
| 1948 | 121 | 381.67 |
| 1949 | 30 | 125.00 |

Respondent determined in his statutory notices of deficiency that the partnership had unreported income from sales (as broken down in the respondent's amendment to his answers in each of the Docket Nos. 77315 through 77318), as follows:

*Fiscal year Apr. 30, 1947*

| | | |
|---|---:|---:|
| Identified sales omitted | | $867.64 |
| Unexplained deposits to partnership bank account and corresponding credit to loan account of George Roe (May 9, 1946) (check) | | 810.00 |
| Unexplained deposits in bank account of George and Jessie: | | |
| Oct. 25, 1946 (check) | $144.66 | |
| Nov. 8, 1946 (check) | [1] 1,249.00 | |
| Jan. 17, 1947 (check) | 66.68 | |
| Feb. 21, 1947 (check) | [1] 32.50 | |
| | | 1,492.84 |
| Total omitted sales | | 3,170.48 |

*Fiscal year Apr. 30, 1948*

| | | |
|---|---:|---:|
| Identified sales omitted | | 24,715.22 |
| Unexplained deposits to partnership bank account and corresponding credits to loan account of Howard Roe: | | |
| Aug. 28, 1947 (cash) | $1,000 | |
| Mar. 24, 1948 (cash) | 1,900 | |
| | | 2,900.00 |
| Unexplained deposit to partnership bank account and corresponding credit to loan account of George Roe on Aug. 28, 1947 (cash) | | 2,000.00 |
| Unexplained deposits in bank account of George and Jessie: | | |
| July 3, 1947 (check) | $15.00 | |
| Aug. 25, 1947 (check) | 42.00 | |
| Nov. 26, 1947 (check) | [1] 250.00 | |
| Dec. 3, 1947 (check) | [1] 1,000.00 | |
| Dec. 19, 1947 (check) | 11.10 | |
| | | 1,318.10 |
| Total omitted sales | | 30,933.32 |

*Fiscal year Apr. 30, 1949*

| | | |
|---|---:|---:|
| Identified sales omitted | | 28,330.95 |
| Unexplained deposit in partnership bank account and corresponding credit (June 17, 1948) to loan account of Howard (cash) | | 2,000.00 |
| Unexplained deposits in partnership bank account and corresponding credits to loan account of George: | | |
| July 22, 1948 (cash) | $500.00 | |
| Nov. 26, 1948 (cash) | 1,000.00 | |
| Dec. 27, 1948 (cash) | 5,000.00 | |
| | | 6,500.00 |

Unexplained deposit in bank account of George and
Jessie:

| | | |
|---|---:|---:|
| July 8, 1948 (check) | $87. 50 | |
| Aug. 19, 1948 (check) | 223. 40 | |
| Sept. 27, 1948 (check) | [1] 190. 00 | |
| Nov. 26, 1948 (cash) | 800. 00 | |
| Nov. 30, 1948 (check) | 85. 73 | |
| Dec. 23, 1948 (check) | [1] 1, 000. 00 | |
| | | $2, 386. 63 |
| Total omitted sales | | 39, 217. 58 |

*Fiscal year Apr. 30, 1950*

| | | |
|---|---:|---:|
| Identified sales omitted | | [4] 17, 675. 44 |

Unexplained deposits in partnership bank account and
corresponding credits to loan account of Howard:

| | | |
|---|---:|---:|
| May 2, 1949 (cash) | $500. 00 | |
| May 5, 1949 (cash) | 2, 000. 00 | |
| May 16, 1949 (cash) | 1, 000. 00 | |
| Aug. 31, 1949 (cash) | 1, 500. 00 | |
| | | 5, 000. 00 |

Unexplained deposits to partnership bank account and
corresponding credits to loan account of George:

| | | |
|---|---:|---:|
| Aug. 23, 1949 (cash) | 1, 200. 00 | |
| Sept. 12, 1949 (cash) | 2, 500. 00 | |
| Sept. 20, 1949 (cash) | 3, 770. 00 | |
| | | 7, 470. 00 |

Unexplained deposits in bank account of George and
Jessie:

| | | |
|---|---:|---:|
| Oct. 4, 1949 (check) | [1] 280. 00 | |
| Oct. 20, 1949 (check) | [2] 220. 00 | |
| Nov. 18, 1949 (check) | 50. 00 | |
| Dec. 6, 1949 (check) | [1] 1, 250. 00 | |
| Dec. 29, 1949 (check) | 1, 575. 00 | |
| Feb. 2, 1950 (check) | 790. 92 | |
| Feb. 27, 1950 (check) | 1,575. 00 | |
| Mar. 28, 1950 (check) | 50. 00 | |
| | | 5, 790. 92 |
| Total omitted sales | | 35, 936. 36 |

*Fiscal year Apr. 30, 1951*

| | | |
|---|---:|---:|
| Identified sales omitted | | [5] 8, 270. 12 |
| Unexplained deposit to partnership bank account and corresponding credit to loan account of Howard (Sept. 15, 1950) (cash) | | 1, 000. 00 |

Unexplained deposits in bank account of George and
Jessie:

| | | |
|---|---:|---:|
| May 26, 1950 (check) | $1, 615. 25 | |
| Aug. 4, 1950 ($100 cash, $55 check) | 155. 00 | |
| Oct. 10, 1950 ($500 cash, $17.31 check) | 517. 31 | |
| Oct. 24, 1950 (cash) | 3, 000. 00 | |
| Dec. 6, 1950 (cash) | 1, 900. 00 | |

| | | |
|---|---|---|
| Jan. 17, 1951 (cash) | $2,000.00 | |
| Feb. 20, 1951 ($1,350 cash, $267.50 check) | [3]1,617.60 | |
| Mar. 19, 1951 (check) | 596.58 | |
| | | $11,401.74 |
| Total omitted sales | | 20,671.86 |

[1] Respondent concedes these amounts (checks).
[2] Respondent concedes $200 of this amount (check).
[3] Respondent concedes $32.56 of this amount (check).
[4] Respondent concedes $80.25 of this amount.
[5] Respondent concedes $155.22 of this amount.

Respondent increased the income of both George and Howard in the years 1947 through 1951 by one-half of the amounts computed by respondent as omitted partnership income in each of the fiscal years ended April 30, 1947 through 1951.

The return filed by petitioner in Docket No. 77318 (George L. Roe) for the year 1947 was false or fraudulent with intent to evade tax. The return filed by petitioner in Docket No. 77315 (Estate of Howard T. Roe, Deceased, George L. Roe, Executor) for the year 1947, and the returns filed by the petitioners in Docket No. 77316 (Estate of Howard T. Roe, Deceased, George L. Roe, Executor, and Eleanor Roe) for the years 1948 through 1951 were not false or fraudulent with intent to evade tax, and are barred by the statute of limitations.

A part of the deficiency for the year 1947 in Docket No. 77318 is due to fraud with intent to evade tax. No part of the deficiencies in Docket Nos. 77315 and 77316 was due to fraud with intent to evade tax.

OPINION.

Respondent claimed that a part of the deficiency for 1947 in Docket No. 77315 (Estate of Howard T. Roe, Deceased, George L. Roe, Executor) and Docket No. 77318 (George L. Roe), and for the years 1948 through 1951 in Docket No. 77316 (Estate of Howard T. Roe, Deceased, George L. Roe, Executor, and Eleanor Roe) and Docket No. 77317 (George L. Roe & Jessie R. Roe, Husband and Wife), was due to fraud with intent to evade tax within the meaning of section 293(b). George and Jessie (Docket No. 77317) conceded on brief that a part of their deficiency for each of the years 1948 through 1951 was due to fraud, and this concession also removes any statute of limitations issue as to the years in that docket. Sec. 276(a). The remaining years 1947 (Docket Nos. 77315 and 77318) and 1948 through 1951 in Docket No. 77316 are barred by section 275(a) unless it is found that the returns filed by the parties for each of those years were false or fraudulent returns with intent to evade tax. Sec. 276(a).

The burden rests upon respondent to prove fraud by clear and convincing evidence, *Arlette Coat Co.*, 14 T.C. 751, which means that on the statute of limitations question, which we shall take up first,

respondent has the burden of establishing by clear and convincing evidence that the returns filed by Howard in 1947 (Docket No. 77315) and by Howard and his wife for the years 1948 through 1951 (Docket No. 77316) and by George in 1947 (Docket No. 77318) were false or fraudulent returns with intent to evade tax. Howard and George must, of course, be treated separately, and the fact that they were equal partners during this entire period is of no significance in itself.

First, as to Howard in the years 1947 through 1951, we have examined the entire record with care and we find it insufficient to establish fraud by the necessary quantum of proof. The record indicates that George supervised the books and records of the partnership throughout these years and that Howard displayed no interest in the books nor, in fact, in the entire office end of the business. George actively managed the business during this period. About 1944 or 1945 the nature of the partnership business changed from smaller repair jobs to the larger installation of boilers, and Howard was not too familiar with the new type of work. During the years before us he made occasional visits to the office and "he principally just occasionally made a round of some of the outside jobs" and his interest in the jobs "was more or less curiosity." Howard's curtailed business activity during this period is explained by his failing health. In 1945, when he was about 60 years old, he suffered a heart attack and soon after had a second attack. The record shows that he was treated from 1948 to 1951 for hypertension and for his heart condition and that by 1951 he was about 50 percent incapacitated.

There is no evidence to show that Howard was aware that the partnership was not reporting all of its sales. The situation here is much like the situation in *Stoumen* v. *Commissioner*, 208 F. 2d 903, affirming a Memorandum Opinion of this Court. There the taxpayer partner disclaimed knowledge of the managing partner's fraudulent acts in connection with the partnership business. While the issue of fraud had been decided in favor of the taxpayer by this Court and was not an issue before the Court of Appeals, the opinion has this pertinent comment with respect to the fraud issue:

The fact that he was unaware of the New York funds, received none of them knowingly, and justifiably relied upon the information contained in the partnership books, was sufficient to show that, though false, his returns were not filed with intent to evade the tax. * * *

We hold that the returns filed by Howard for the year 1947 and by Howard and his wife for the years 1948 through 1951 were not false or fraudulent with intent to evade tax.

We reach a different conclusion as to George's return for the year 1947. It is apparent from the record that George, who will hereinafter sometimes be called the petitioner, directly supervised the books and records of the partnership, that he opened all the mail, and that he was generally in charge of the partnership's operations in the years

1947 through 1951. George admitted that during the fiscal year April 30, 1947, there were five checks from a customer in the amount of $768.01 which were omitted from sales on the partnership books. Consequently he understated his income in his 1947 income tax return by one-half of this amount, which constituted his share of the partnership income. No satisfactory explanation is offered for these omitted checks. In the context of this record we believe that these omitted sales receipts were a part of the pattern over the entire period 1947 through 1951 when checks from customers for boiler work done were systematically omitted from sales. George admitted that, in addition to the omitted sales receipts in 1947, the following sales receipts, by check, were omitted from sales: $24,715.22, $28,330.95, $17,595.19, and $8,114.90 in the fiscal years 1948 through 1951. We hold that the income tax return filed by George for the year 1947 was false or fraudulent with intent to evade tax.

Our discussion of the fraud issue under section 276(a) is equally applicable to the question of whether a part of George's deficiency for 1947 was due to fraud with intent to evade tax. Sec. 293(b). We hold that respondent has met his burden on this issue by clear and convincing evidence.

George had a 50 percent interest in the partnership during the years 1947 through 1951. He reported no income from any source other than the partnership for the years 1947 through 1950. Consequently his unreported income for those years turns upon the amounts of unreported partnership income during this period. He reported $1,213.08 income from "Wings, Inc.—Airplane Rental" in 1951 but such income is not suggested as a possible explanation for unexplained items in his bank account which we will refer to later.

George admitted that checks, representing sales receipts, were omitted from the partnership's books in the fiscal years ended April 30, 1947 through 1951, in the respective amounts of $867.64, $24,715.22, $28,330.95, $17,595.19, and $8,114.90. Respondent has added to these amounts of admittedly unreported sales certain unexplained deposits made in the partnership bank account from time to time and which were identified on the partnership's books as loans from the partners in the fiscal years 1947 through 1951 in the respective amounts of $810, $4,900, $8,500, $12,470, and $1,000. Except for the deposit of $810, which was an unexplained check, the deposits listed above were in cash. Also, the respondent treated as unreported partnership sales certain deposits, purportedly unexplained, which were made to the joint bank account of George and Jessie over the fiscal years 1947 through 1951 in the respective amounts of $211.34, $68.10, $1,196.63, $4,060.92, and $11,369.18. The deposits to the joint account over these fiscal years were made both in currency and by checks, and we have listed these in our Findings of Fact.

Respondent's determination that the unexplained deposits to the two bank accounts is presumptively correct, *Welch* v. *Helvering*, 290 U.S. 111, and the petitioner has the burden of proving it is erroneous. George contends that the currency deposit of $2,000 made on June 17, 1948, to the partnership bank account and credited on the partnership books as a loan from Howard, was part of the proceeds of $2,400 which Howard obtained on June 3, 1948, when he cashed three partnership checks made out to him for office rent. These checks were dated December 8, 1947, April 30, 1947, and June 3, 1948, in the respective amounts of $800, $1,200, and $400 and the first two checks that were issued bear a notation that they were intended for rental payments. George testified that the long delay in cashing the first two checks was due to a shortage of partnership funds in the bank at that time. We are satisfied that George has met his burden of showing that this $2,000 item is not includible in the partnership's unreported sales for the fiscal year ended April 30, 1949.

As we have indicated, the unexplained deposits which respondent included in the partnership's sales consisted of both currency and checks. There is no satisfactory explanation in the record as to the source of these check deposits and consequently we sustain the respondent's determination that they represent unreported partnership sales. As for the currency deposits, George testified that some of the checks from customers, which he admits were unreported on the partnership's books, were cashed and that some of the proceeds were deposited in the partnership's bank account and in the joint account of George and his wife. There was testimony that the checks from customers were cashed and the cash placed in the office safe, so that cash was on hand throughout much of this time. Moreover, the evidence shows that many of the checks which were unreported were deposited directly in the partnership's bank account and in the joint account, and there is no reason to doubt that George cashed some of the other unreported checks and then made cash deposits in the two bank accounts. There was testimony by petitioner's witnesses that the partnership's customers made their payments by check, which would remove the possibility that some of the currency deposits were from unreported cash sales. We hold that the petitioner, George Roe, has met his burden of showing that the so-called unexplained cash deposits in the partnership's bank account and in the joint account of George and his wife came from the cashing of the unreported sales checks, which the respondent has already included as unreported partnership income.

We must next decide whether the partnership in each of the fiscal years ended April 30, 1947 through 1951, is entitled to additional deductions for purported commissions paid to Kluttz and Frankel. Kluttz was paid 50 percent of the net profit on jobs performed by

him and Frankel received a 5 percent commission on work obtained by him. This issue appears for the first time in the amended petitions in these dockets, where it is alleged that these additional deductions were $500, $5,150, $6,500, $5,900, and $3,600 in the fiscal years 1947 through 1951, respectively, or a total of $21,650. At the trial this amount was reduced to $14,354.87, with $318 of this for Frankel and $14,036.87 for Kluttz. There is nothing in the partnership's books and records to show that these amounts were paid. Apart from George's testimony that he paid these two men their shares of the omitted checks, there is nothing in the record to support these deductions. On cross-examination Kluttz testified that these commissions were "all paid by check," which contradicted the petitioner's argument that the payments were made in cash and therefore could not be identified. Upon the basis of the whole record, we hold that petitioner has failed to meet his burden on this issue.

Petitioner in his amended petition also claims deductions, in addition to those claimed in the partnership returns, for entertainment of customers and for labor and materials of $1,200 in each of the fiscal years 1947 through 1951. Petitioner has the burden of showing that he made these expenditures and that they were ordinary and necessary expenditures within the meaning of section 23(a). Petitioner admits that these purported expenses were not recorded. He also admits he never made any record of spending the money. Nor is there anything in the record to establish the nature of these expenditures, if they were ever made. The partnership returns for these fiscal years show substantial expenditures claimed and, for the most part, allowed by respondent. Petitioner's bare statements that these additional expenditures were made are, therefore, completely without any support in the record. With the record in this condition, we hold that petitioner has failed to prove that he is entitled to these deductions in addition to those already allowed in the fiscal years ended April 30, 1947 through 1951.

The next issue is whether a closing inventory of $20,000 on April 30, 1949, should be ignored in computing the partnership's net income for that fiscal year. This, of course, would decrease the partnership's net income for that fiscal year. Petitioner's argument on this question is somewhat confusing. He first argues that the use of inventories is inconsistent with the cash method of accounting. Then he states that at the end of the fiscal year 1949 the partnership actually had on hand supplies "in the neighborhood of $1,500 to $2,000." Finally, he tries to explain away the $20,000 closing inventory, which appears in the profit and loss statement in the partnership's return of income for the fiscal year 1949, as follows:

Counsel for Petitioners believes Welsh entered the arbitrary amount of $20,000 in income because he was disturbed by the excess of the checks George

Roe was withholding from income over the expenses he was not reporting. Probably the net income on the return was not very different from the true net income by reason of this entry.

The books show the entry was a complete fiction and that inventories were not thereafter used by Welsh (at least during the 1947–51 period (returns for all later years are not in evidence)) in determining income.

Even though George signed the partnership return for the fiscal year 1949, he claims he had no idea the inventory figure was in there. He testified that he gave no instructions to Alfred Welsh, who audited the books and prepared the partnership returns, about taking any inventory, and that he had "no explanation" for the existence of this item. George further testified that Welsh "put the inventory on the books without discussing it with me." There is testimony in the record that Welsh had years of experience as a bookkeeper and as an auditor, and it is inconceivable that on his own initiative and with no consultation with his employer, Alfred Welsh would create an inventory item out of thin air. Nor do we give any credence to George's conjecture that Welsh invented this item because he was disturbed about the checks George was omitting from sales.

It will only be necessary to make two further observations. First, there is evidence that the partnership was doing work in a wide area along the east coast and that materials were, as a rule, shipped directly from supplier to the jobsite. We do not know why the petitioner, in estimating his supplies on hand at the end of the fiscal year 1949 at about $1,500 to $2,000, limits himself to the supplies in the company yard and completely ignores the materials at the jobsite. Second, while it is true the use of inventories is generally associated with the accrual system of accounting, there are instances when inventories can be used with the cash method and still clearly reflect income. *Stanford R. Brookshire*, 31 T.C. 1157, affd. 273 F. 2d 638, certiorari denied 363 U.S. 827; *Glenn* v. *Kentucky Color & Chemical Co.*, 186 F. 2d 975. It would seem this might well be true when the taxpayer is in a service business and the inventory is used in the business and not held primarily for sale. At any rate it is well known there are deviations from what is predominantly a cash or accrual system. Petitioner's argument that we hold as a matter of law that the partnership's use of an inventory was wrong merely because it used a cash method of accounting is without merit.

Respondent claimed that petitioner in 1947 and petitioner and his wife in 1948 and 1949 are liable for additions to tax under section 294(d)(2). This section provides for an addition to tax in every case where the tax estimated by a taxpayer is less than 80 percent of his actual tax liability for a particular year. The section is mandatory. The additions to tax can be made in the Rule 50 computation in accordance with this opinion.

*Decisions will be entered under Rule 50.*